Birdie Mae DAVIS et al., Appellants,

v.

BOARD OF SCHOOL COMMISSIONERS OF MOBILE COUNTY et al., Appellees.

UNITED STATES of America, Appellant,

v.

BOARD OF SCHOOL COMMISSIONERS OF MOBILE COUNTY et al., Appellees.

Nos. 25162, 25175.

United States Court of Appeals Fifth Circuit.

March 12, 1968.

As Modified on Denial of Rehearing April 26, 1968.

No. 25162:

Vernon Z. Crawford, Mobile, Ala., Charles H. Jones, Jr., New York City, Frank Dunbaugh, Walter Gorman, Attys., Dept. of Justice, Washington, D. C., Michael Davidson, New York City, Jack Greenberg, New York City, Frankie L. Fields, Mobile, Ala., Norman C. Amaker, New York City, John Doar, Asst. Atty. Gen., Owen M. Fiss, Brian K. Landsberg, Frank W. Hill, Attorneys, Department of Justice, Washington, D. C., for appellants.

Abram L. Philips, Jr., Mobile, Ala., Palmer Pillans, George F. Wood, Mobile, Ala., for appellees.

No. 25175:

Charles H. Jones, Jr., New York City, Vernol R. Jansen, Jr., U. S. Atty., Mobile, Ala., Walter Gorman, Frank M. Dunbaugh, Attys. Dept. of Justice, Washington, D. C., Vernon Z. Crawford, Mobile, Ala., Jack Greenberg, Michael Davidson, New York City, Frankie L. Fields, Mobile, Ala., Norman C. Amaker, New York City, John Doar, Asst. Atty. Gen., Owen M. Fiss, Brian K. Landsberg, Frank W. Hill, Attorneys, Department of Justice, Washington, D. C., for appellants.

A. L. Philips, Jr., Mobile, Ala., Palmer Pillans, George F. Wood, Mobile, Ala., for appellees.

Before MARIS,* THORNBERRY and AINSWORTH, Circuit Judges.

THORNBERRY, Circuit Judge:

In the face of a vexing, continuing problem, this Court decreed that school boards in this Circuit have an affirmative duty to effectuate a transition to unitary racially nondiscriminatory school systems. This means integration of faculties, facilities, and activities, as well as students. The time for implementing programs that work is now. United States v. Jefferson County Board of Education, 5th Cir. 1967, 372 F.2d 836, aff'd en banc, 380 F.2d 385, cert. denied sub nom., Caddo Parish School Board v. United States, 1967, 389 U.S. 840, 88 S. Ct. 67, 19 L.Ed.2d 103.

With the law in mind, we turn once again to Mobile County, Alabama.[1] In 1966, another panel considered Mobile's plan for desegregation of schools and found it deficient in several respects:

Principal among these [defects] is the fact that even as to those grades which, under the plan, have actually become "desegregated" there is no true substance in the alleged desegregation. Less than two-tenths of one percent of the Negro children in the system are attending white schools. Another defect is the length of time that the plan would require to come to a final fruition; another is the option given to white students living within the "area" or "district" of a given school to transfer to another district or area to attend a white school there, without the granting of a similar option to a Negro child residing within the area of a Negro school to transfer to a white school outside the area; a further significant defect is the lack of provision for a Negro child to attend

---

* Of the Third Circuit, sitting by designation.

1. Counting temporary measures and appeals on the merits, litigation concerning the desegregation of Mobile schools has now been before the Fifth Circuit five times since 1963.

a school offering particular subjects if such subjects are taught only in white schools; and finally, there is the failure of the plan to start desegregation of the faculties of the schools.

Davis v. Board of School Commissioners of Mobile County, 5th Cir. 1966, 364 F.2d 896, 901. The school board attempted to meet these objections and to comply with the Court's decision by (a) drawing new boundary lines for some of the school attendance areas or geographic zones, (b) making optional schools outside of attendance areas available to Negroes as well as whites, and (c) taking steps toward gradual faculty desegregation. In the urban areas of the county, a Negro or white student can now attend (a) the school serving his attendance area, (b) the nearest formerly white school serving his residence, or (c) the nearest formerly Negro school serving his residence. The optional schools, i. e., the nearest formerly white and formerly Negro schools, are available only to students in the following categories: (a) Those enrolling for the first time in the Mobile Public School System; (b) those enrolling in the first grade; (c) those who change their residence from one attendance area to another; (d) those going from elementary to junior high school or from junior high school to senior high. Transfer subject to approval is available to students of any grade. In the rural areas of the county, a Negro or white student can attend (a) the nearest formerly white school serving his residence or (b) the nearest formerly Negro school serving his residence. Because of the relatively small number of schools and the widely scattered population, the board did not consider attendance areas practical for the rural areas. As for faculty desegregation, the board selected a small number of white and Negro teachers to whom to offer the *option* of transferring to a school in which students and teachers of the opposite race predominate.

The district court held that the boundary lines for the attendance areas had been drawn on a nonracial basis and that the school board's over-all plan for desegregation of students was in substantial compliance with the Fifth Circuit decisions. The court also held that the board had made an adequate start toward desegregation of faculty.[2] While many subsidiary issues are raised on this appeal, the fundamental ones are whether this Court can put its stamp of approval on the attendance-zone lines drawn by the school board and the free-choice plan engrafted onto attendance zones and whether it can affirm the finding that the board has made an adequate start toward desegregation of faculty.

I.  *Students*

We look first to the results produced by appellee's plan for integrating students in Mobile County. The Mobile Public School System, the largest in Alabama, has 93 schools. In round numbers, there are 44,000 white students and 31,000 Negroes for a total of 75,000. According to appellee's figures for the current school year (1967–68), there are 33 biracial schools in the system as compared with 15 a year ago. 29,031 students attend biracial schools as compared with 15,650 in 1966–67. 27,023 of the students attending biracial schools are white and 2,008 are Negro. There are 692 Negroes attending schools of pre-

2. After exhaustive hearings the district court entered an "interim order" on August 24, 1967 requiring the Board of School Commissioners to afford Negro students in the metropolitan area an opportunity to transfer to predominantly white schools serving the areas of their residences as a result of boundary changes. The transfer period was to be held from August 28 through August 31; pupils were to be allowed to transfer to the new schools made available by the boundary changes or to the nearest formerly white or formerly Negro schools serving their residences. On October 13, 1967, the court denied the motions filed by appellants for further relief and entered the findings discussed in the text. This Court had previously denied appellants' motion for injunction pending appeal on September 13, 1967. This appeal was expedited.

dominantly white enrollment and 4 white students attending schools of predominantly Negro enrollment. Accepting the fact that this Court uses the HEW guidelines as a yardstick for measuring the progress of desegregation in particular school districts, the school board argues that it has more than satisfied HEW percentages. While the Guidelines require that a district employing a freedom-of-choice plan for at least two years have 15 to 18 per cent of its student population in desegregated schools, Mobile now has 29,031 or 38 per cent of its students in biracial schools.

■ The percentage of total students in biracial schools is superficially acceptable, but beneath the surface the picture is not so good. In its per curiam adopting the panel's opinion in *Jefferson County*, this Court said that school desegregation can first be measured quantitatively, using percentages as a rough rule of thumb, but ultimately must be measured qualitatively, judging whether schools are still identifiable as white or Negro. 380 F.2d, at 389–390. Judging by the qualitative standard and by what we conceive to be the spirit of *Jefferson County*, we are unable to say that Mobile's plan is working so well as to make judicial interference unnecessary at this time. Two-thirds of the schools remain totally segregated and unquestionably identifiable as Negro or white; desegregation of the remaining schools has been so minimal that it would be generous to say they are no longer identifiable as Negro or white. Though Negroes comprise about 41 per cent of the student population, the crucial fact is that only 2,008 or 6.5 per cent of them are experiencing a desegregated education. Moreover, this figure of 6.5 per cent can realistically be reduced to 2 per cent (692) because 1,316 of the 2,008 Negroes attending biracial schools are in schools attended by only 4 white students. The only Negroes really experiencing a desegregated education are the 692 attending schools of predominantly white enrollment. Although this is 511 more than the number of Negroes who attended predominantly white schools last year (181), it is inarguable that the percentage of Negroes experiencing a desegregated education is still too low. The number of Negro children in school with white children is so far out of line with the ratio of Negro school children to white school children in the system as to make inescapable the inference that discrimination yet exists. See *Jefferson County*, supra, 372 F.2d, at 887.

■ Having found the results of the present plan unsatisfactory, we turn to the difficult question of what should be done. Our primary concern is to see that attendance zones in the urban areas of Mobile County be devised so as to create a unitary racially nondiscriminatory system. Appellee contends, and the district court found, that boundary lines for the zones were drawn on a nonracial basis, using objective criteria such as natural landmarks and safety factors; but there is no information in the record by which this Court can judge whether the district court's determination was correct or not. The school officials who testified were unable to state clearly what criteria they used in determining the location of the various lines, and they were unable to produce the source material—maps, charts, memoranda, etc.—they used. For the benefit of reviewing judges who may be unfamiliar with the city or county in question, it is essential that school officials be able to state what criteria were used in determining geographic zones and to produce evidence to support their statements. In this case, it will be necessary for the board to do the job again, this time making a survey of the type suggested by appellants. On the basis of information obtained from the survey, school officials will draw attendance-zone lines on what they conceive to be a nonracial basis. If there is further litigation, evi-

dence should be available to test the validity of the board's action.[3]

■ The school board has decided that assignment of students in its system should be based primarily on an attendance-area plan. Indeed, in a system as large as Mobile's, this approach is surely more practical than a pure free-choice plan. We therefore accept the board's policy decision in this regard but insist on a survey and a new effort to draw zone lines on a nonracial basis so that the attendance-area plan will promote desegregation rather than perpetuate segregation. It is intended that attendance areas be designated according to strictly objective criteria with the caveat that a conscious effort should be made to move boundary lines and change feeder patterns which tend to preserve segregation.[4] In the future, any boundary lines which simply encircle Negro residences without being explainable in terms other than race will be constitutionally suspect. To go a step farther, we hold that once attendance zones have been properly designated, the student's option to attend the nearest formerly white or formerly Negro school outside his zone must be eliminated.

■ It is important to clarify our reason for interfering with school management to the extent of requiring abandonment of the limited options. Under *Jefferson County*, a court is justified in requiring a board to change a particular school-attendance plan only when it is shown that the current plan does not work.[5] In the instant case, the board has been on notice since it was last before this Court that a small percentage of Negroes attending school with white students represents a significant defect. After nearly two years, the percentage of Negroes experiencing a desegregated education has increased from .2 per cent

3. To support their assertion that the present attendance zones perpetuate segregation, appellants point out that in downtown Mobile there are overcrowded Negro schools in the same vicinity as underpopulated white schools and also that in many instances a school is located on the periphery of the attendance area it serves rather than in the center. These facts, they say, suggest that considerations other than convenience of the students, namely race, determined the present zones. The board makes somewhat unpersuasive rebuttals to these points. We trust that when a survey is made and attendance-zone lines are thereafter drawn on a nonracial basis, these objections will not have to be renewed by appellants.

4. We have the impression that desegregation will be greatly advanced in Mobile if all students attend schools serving nonracial zones. In this regard, we quote from footnote 1 of the per curiam entered by the Court in Jefferson County:
"In the South," as the Civil Rights Commission has pointed out, the Negro "has struggled to get into the neighborhood school. In the North, he is fighting to get out of it." Civ.Rts.Comm. Rep., Freedom to the Free. 207 (1963) 380 F.2d, at 389.

5. We do not say that we are imposing a full-scale change of attendance plan on Mobile. The board has said that its primary allegiance is to the attendance-area or neighborhood-school concept as distinguished from pure freedom of choice. We would merely require the board to be true to that allegiance. In *Jefferson County*, the Court accepted local decisions to use freedom of choice but required certain changes which would promote desegregation rather than perpetuate segregation. In this case, we accept the local decision to use an attendance-area plan but require a change which we are convinced will promote desegregation. It seems clear to us that the selection of schools outside of geographic zones is thwarting progress that could be made if each student were confined to the schools serving his zone absent a nonracial reason for transfer. Therefore, we require the elimination of optional schools.
The district judge found that the limited options add a needed flexibility to the attendance-area plan—needed because students and parents have likes and dislikes that should be respected. In the interest of creating a system that measures up to constitutional standards, these options must nevertheless give way. As the Court said in *Jefferson County*, a student has no constitutional right to free choice of schools. 380 F.2d at 390. The school board, on the other hand, has a constitutional duty to desegregate its system.

to 2 per cent. Coming so late in the day, this is not enough progress. The idea of superimposing limited options on an attendance-area plan has failed to bring Mobile very far along the road toward the ultimate goal of a unitary system wherein schools are no longer recognizable as Negro or white. Since it is evident that the process of selecting optional schools has somehow thwarted the progress of desegregation, the logical solution is the abandonment of limited options.[6] As the Court said in the per curiam entered in *Jefferson County*, freedom of choice is not a goal in itself but one of many approaches available to school boards. If it does not work, another method must be tried. 380 F.2d, at 390. Since the limited options have not worked, we hold that after the boundary lines have been redrawn on a nonracial basis, each student in the urban areas must attend the schools serving his attendance zone absent some compelling nonracial reason for transfer.

Our discussion of attendance zones is confined to the urban areas; at this time, we defer to the board's view that zones would be impractical in the rural parts of the county. If school officials should change their minds and decide to try an attendance-area plan in the rural areas, there must, of course, be a survey. If, on the other hand, the board should continue to limit the options of rural students to the nearest formerly white and formerly Negro schools serving their residences, the steps outlined for a free-choice plan in the *Jefferson County* decree must be followed. We stress particularly the transportation provision of that decree. 380 F.2d, at 392.

## II. *Faculty*

In the last Mobile case, Judge Tuttle said there must "be an end to the present policy of hiring and assigning teachers according to race by the time the last of the schools are fully desegregated for the school year 1967–68." 364 F.2d, at 904. In response to this directive, the board offered to a small group of teachers the option to transfer to a school in which students and teachers of the opposite race predominate. The most recent figures indicate that 12 Negroes have elected to teach in predominantly white schools and 3 whites have elected to teach in predominantly Negro schools. Despite the Court's decree, it seems apparent that the policy of hiring and assigning teachers according to race still exists. In a system having approximately 2700 teachers, the surface of the problem of faculty segregation is hardly scratched by the transfer of 15 teachers to schools of the opposite race. The reason for the lack of progress is that the board has not yet shouldered the burden. While any sound program should encourage voluntary transfers, the responsibility for faculty desegregation, just as the responsibility for student desegregation, lies ultimately with the board, not the teachers. Accordingly, we have entered a decree requiring the board to take positive steps by way of assigning teachers to schools of the opposite race. In the final analysis, the pattern of teacher assignment to a particular school must not be identifiable as tailored for a heavy concentration of either Negro or white students. Our provisions for faculty desegregation follow the ones entered by another panel of this Court in Stell v. Board of Education for the City of Savannah and the County of Chatham, 5th Cir. 1967, 387 F.2d 486.

We enter a decree along these lines because faculty integration has been recognized as the key to integration of all phases of education in a school system. As Judge Wisdom said in *Jefferson County*,

6. The district court found that a majority of the present geographic zones have both races residing within them. This finding persuades us that if all students attended schools serving their zones, there would be more desegregation than there is.

When a further effort is made to devise nonracial zones and to eliminate boundary lines and feeder patterns designed to perpetuate segregation, Mobile may at least achieve a unitary system. .

Yet until school authorities recognize and carry out their affirmative duty to integrate faculties as well as facilities, there is not the slightest possibility of their ever establishing an operative nondiscriminatory school system.

372 F.2d, at 892. He goes on to quote with approval the following statement by the Eighth Circuit in Clark v. Board of Education of the Little Rock School District, 8th Cir. 1966, 369 F.2d 661, 670:

> The lack of a definite program will only result in further delay of long overdue action. We are not content at this late date to approve a desegregation plan that contains only a statement of general good intention. We deem a positive commitment to a reasonable program aimed at ending segregation of the teaching staff to be necessary for the final approval of a constitutionally adequate desegregation plan.

■ On the whole, the provisions of our decree are designed to effectuate (a) the survey of the system, (b) the establishment of an attendance-area plan with attendance-zone lines drawn on a nonracial basis, and (c) desegregation of faculty. The decree does not concern assignment of students in the rural areas; but we repeat that if there are to be options but no attendance zones, the steps outlined in the *Jefferson County* decree for a free-choice plan must be followed. Somewhat apart from the general objectives just enumerated, we have also decreed full integration of interschool activities. Although Negroes and whites play together on athletic teams in biracial schools, the board acknowledges that all-Negro teams are not scheduled against all-white teams. Such a distinction based on race is no longer tolerable; the integration of activities must be complete. *Jefferson County*, supra, 372 F.2d, at 846, footnote 5.

The judgment of the trial court is reversed and the case is remanded for entry of the decree attached to this opinion.

## DECREE

It is ordered, adjudged and decreed that the appellees, their agents, officers, employees and successors and all those in active concert and participation with them be and they are permanently enjoined from discriminating on the basis of race or color in the operation of the Mobile school system. · As set out more particularly in the body of the decree, they shall take affirmative action to disestablish all school segregation and to eliminate the effects of the dual school system. As stated in the opinion of the Court of Appeals, the primary concern is that attendance-zone lines be drawn on a nonracial basis. To this end the board will conduct a survey as more specifically described in Section IV herein.

## I.

## STUDENT ASSIGNMENT

A. The appellees shall, to the extent feasible, make assignments of students and draw attendance area lines in such a way as to eliminate the effects of past racial decisions in assigning students, drawing attendance lines, and constructing school buildings.

B. Appellees shall arrange for the conspicuous publication of an announcement, giving detailed information as to the name and location of schools to which students have been assigned for the coming school year pursuant to the desegregation plan, in the newspapers most generally circulated in the community between March 1 and March 31 of each year. Publication as a legal notice is not sufficient. Whenever any revision of attendance zones is proposed, appellees shall similarly arrange for the conspicuous publication of an announcement at least 30 days before any change is to become effective, naming each to be affected and describing the proposed new zones. Copies of all material published hereunder must also be given at that time to all television and radio stations serving the community. Copies of this notice and decree shall be posted in each

school in the school system and at the office of the Superintendent of Education.

C. A street or road map showing the boundaries of, and the school serving, each attendance zone and a chart showing feeder patterns must be freely available for public inspection at the office of the Superintendent. Each school in the system must have freely available for public inspection a map showing the boundaries of its attendance area, and a chart showing its feeder pattern. A copy of this map and chart shall be given to the Parent Teachers Association at each school.

D. After the attendance areas are redrawn to achieve the desegregation of the system as provided in section IV of this decree, all students will be required to attend the school serving their zone, absent some compelling nonracial reason.

## II.

### CONSTRUCTION

To the extent consistent with the proper operation of the school system as a whole, the school board will, in locating and designing new schools, in expanding existing facilities, and in consolidating schools, do so with the object of eradicating past discrimination and of effecting desegregation. The school board will not fail to consolidate schools because desegregation would result.

Until such time as the Court approves a plan based on the survey conducted pursuant to section IV herein, construction shall be suspended for all planned building projects at which actual construction has not been commenced.

Leave to proceed with particular construction projects may be obtained prior to the completion of the survey upon a showing by the appellees to the Court, that particular building projects will not have the effect of perpetuating racial segregation.

## III.

### FACULTY AND STAFF ASSIGNMENTS

A. *Faculty Employment.* Race or color shall not be a factor in the hiring, assignment, reassignment, promotion, demotion, or dismissal of teachers and other professional staff members, including student teachers, except that race may be taken into account for the purpose of counteracting or correcting the effect of the segregated assignment of faculty and staff in the dual system. Teachers, principals, and staff members shall be assigned to schools so that the faculty and staff is not composed exclusively of members of one race. Wherever possible, teachers shall be assigned so that more than one teacher of the minority race (white or Negro) shall be on the desegregated faculty. The Board will continue positive and affirmative steps to accomplish the desegregation of its school faculties and to achieve substantial desegregation of faculties in its schools for the 1968–69 school year notwithstanding teacher contracts for 1968–69 may have already been signed and approved. The tenure of teachers in the system shall not be used as an excuse for failure to comply with this provision. The appellees shall establish as an objective that the pattern of teacher assignment to any particular school not be identifiable as tailored for a heavy concentration of either Negro or white pupils in school.

B. *Dismissals.* Teachers and other professional staff members may not be discriminatorily assigned, dismissed, demoted, or passed over for retention, promotion, or rehiring, on the ground of race or color. In any instance where one or more teachers or other professional staff members are to be displaced as a result of desegregation, no staff vacancy in the school system shall be filled through recruitment from outside the system unless no such displaced staff member is qualified to fill the vacancy. If, as a result of desegregation, there is to be a reduction in the total professional staff of the school system, the qualifi-

cations of all staff members in the system shall be evaluated in selecting the staff member to be released without consideration of race or color. A report containing any such proposed dismissals, and the reasons therefor, shall be filed with the clerk of the Court, serving copies upon opposing counsel, within five (5) days after such dismissal, demotion, etc., as proposed.

C. *Past Assignments.* The appellees shall take steps to assign and reassign teachers and other professional staff members to eliminate the effects of the dual school system.

## IV.

### SURVEY

The appellees shall conduct a survey of their school system and report to the Court, by June 1, 1968, the results of such survey, and shall specifically report as follows:

A. The appellees shall prepare a map for each school showing the location, by race and grade, of each student in the school system during the 1967–68 school year.

B. Recommendations for redrawing attendance zone lines to achieve desegregation of the schools.

C. Recommendations for the reorganization of the "feeder" system consistent with the objective of achieving desegregation.

D. A description of each school in the school system to include:

1. The size of each site and whether it is suitable for permanent use, suitable for temporary use, or should be abandoned;

2. The number of buildings on each site and as to each, whether it is suitable for permanent use, suitable for temporary use or should be abandoned;

3. The standards and criteria used to determine whether buildings and sites are suitable for permanent use, suitable for temporary use, or should be abandoned;

4. The number of regular, special and portable classrooms at each school building and the number of square feet in each such classroom;

5. Recommendations for the future use (including grades to be accommodated) of each school building and site for the next ten years, including the need for additional classrooms and the information upon which such recommendations are based.

E. A property inventory to include:

1. A list of all sites currently owned;

2. A list of all sites which the appellees have present plans to acquire and the size and intended use of such sites;

3. The basis for selection of all sites listed under numbers 1 and 2.

F. The status of construction of each school building currently under construction and the status of planning for the use of sites currently owned.

G. A forecast of enrollment at each school for the next ten years and the information upon which such forecast shall be based.

## V.

### SERVICES, FACILITIES, ACTIVITIES AND PROGRAMS

No student shall be segregated or discriminated against on account of race or color in any service, facility, activity, or program (including transportation, athletics, or other extra-curricular activity) that may be conducted or sponsored by the school in which he is enrolled. A student attending school for the first time on a desegregated basis may not be subject to any disqualification or waiting period for participation in activities and programs, including athletics, which might otherwise apply because he is a transfer or newly assigned student except that such transferees shall be subject to longstanding, non-racially based rules of city, county, or state athletic associations dealing with the eligibility of transfer students for athletic contests. All school use or

school-sponsored use of athletic fields, meeting rooms, and all other school related services, facilities, activities, and programs such as commencement exercises and parent-teacher meetings which are open to persons other than enrolled students, shall be open to all persons without regard to race or color. All special educational programs conducted by the appellees shall be conducted without regard to race or color. Athletic meets and competitions and other activities in which several schools participate shall be arranged so that formerly white and formerly Negro schools participate together.

## VI.
### REPORTS

A. On June 10, of each year beginning in 1968, appellees will submit a report to the Court, and serve copies on opposing counsel, showing the number of persons, by school, grade (where appropriate), and race they anticipate will be employed for the fall semester. Within one week after the day classes begin for the fall semester in 1968 and each succeeding year appellees will submit a report to the Court, and serve a copy on opposing counsel, showing the number of teachers actually working at each school by grade (where appropriate) and race. In 1968, a date later than June 10 may be appropriate because of the survey.

B. On the same dates set forth in VI(A) above, reports will be submitted to the Court, and a copy served on opposing counsel, showing the number of students by school, grade, and race, expected and actually enrolled at the schools in Mobile County.

C. Within one week after the opening of each school year, appellees shall submit a report to the Court and serve copies on opposing counsel, showing the number of faculty vacancies, by school, that have occurred or been filled by the appellees since the order of this Court or the latest report submitted pursuant to this subparagraph. This report shall state the race of the teacher employed to fill each such vacancy and indicate whether such teacher is newly employed or was transferred from within the system. The tabulation of the number of transfers within the system shall indicate the schools from which and to which the transfers were made. The report shall also set forth the number of faculty members of each race assigned to each school for the current year.

## ON PETITION FOR REHEARING

### PER CURIAM:

Appellee's motion for rehearing in the above styled cases is denied, except that the Decree issued by this Court for entry by the District Court will be modified as follows:

1. Under Section IV–A, appellee will be permitted to consolidate the survey information on two maps—one to cover the urban area and the other the rural area—so long as the information is reported on the consolidated maps in a clear and comprehensible manner. However, the survey must designate students by grade.

2. Under Section IV–C, the date of submission of recommendations for the reorganization of the feeder system of assignments to secondary schools will be postponed from June 1, 1968 to August 1, 1968.

3. Likewise, under Section IV–D–5, the date of submission of recommendations for the future use of all school plants and sites for the next ten years will be postponed from June 1, 1968 to August 1, 1968.

4. Under Section IV–G, the date of submission of the forecast of enrollment at each school for the next ten years will be postponed from June 1, 1968 to December 1, 1968.