That statement still has controlling force today.

Counsel will prepare an appropriate order.[33]

**Robert L. ACREE et al., Plaintiffs,**

v.

**COUNTY BOARD OF EDUCATION OF RICHMOND COUNTY et al., Defendants.**

**Civ. A. No. 1179.**

United States District Court
S. D. Georgia,
Augusta Division.

July 14, 1969.

John H. Ruffin, Jr., Augusta, Ga., for plaintiffs.

Franklin H. Pierce, Augusta, Ga., for defendants.

**SECOND ORDER OF COURT**

LAWRENCE, Chief Judge.

On December 27, 1968, 294 F.Supp. 1034, I handed down an order in which I ruled that the freedom of choice plan now in existence in Richmond County is constitutionally unacceptable. I held that a zoning plan should be put into effect. I did not rule out freedom of choice altogether but said that the Court "would give consideration to a plan formulated by the Board which combines automatic assignment of pupils within designated geographical zones and a limited freedom of choice of schools."

---

The Order fixed a time schedule for presentation of a new plan by the Board of Education as follows:

"March 1, 1969. Filing of a progress report in connection with the presentation of the proposed plan.

April 1, 1969. Presentation of proposed attendance zones or areas (along with criteria), taking into effect the changes in zones that will necessarily accompany the completion of certain new schools by the 1970 school year.

May 1, 1969. Presentation to the Court of the proposed plan covering the school years 1969–'70 and 1970–'71. The plan will be in line with the directions and rulings in this Order.

June 1, 1969. Approval by the Court of a new plan for desegregation of the Richmond County schools."

The Board generally complied with this schedule. The Superintendent of Schools, Roy E. Rollins, prepared at its direction, proposed geographic attendance zones for each school. The Board informally approved same.

Last May counsel for the plaintiffs asked leave to file objections at some date after June 1st. This request I granted. At the earliest opportunity a hearing was held by me at Augusta. This was on June 16th. Plaintiffs presented their objections and the School Board defended the plan. Plaintiffs' attorney rejects the proposed plan *in toto*. He contends that the evidence "showed conclusively that the Board has made little effort to dismantle the segregated system in Richmond County. Mr. Rollins testified that he has no idea of how many children are in the proposed zones, he left freedom of choice in three (3) areas where black and white schools are almost adjacent." Plaintiffs further maintain that principals and faculties are still assigned to schools on a segregated basis.

In my December 27, 1968 Order I stated: "Zones must, of course be drawn without an eye to racial consequence except to promote desegregation and not to perpetuate segregation. Zoning will be of primary significance in any new plan presented by the Board."

No transcript of the evidence at the hearing on June 16, 1969 was made. As I recall the testimony, Mr. Rollins said that the basic criteria used were natural boundaries, proximity of pupils to schools and maximum utilization of school buildings.

■ The decisions of the Court of Appeals for the Fifth Circuit say that geographic zones are acceptable only if they tend to disestablish rather than reinforce the dual system of segregated schools. Davis v. Board of School Commissioners of Mobile County, 393 F.2d 690; United States of America v. Greenwood Municipal Separate School District, 406 F.2d 1086 (Feb. 4, 1969); Henry v. Clarksdale Municipal Separate School District, 409 F.2d 682. A school board must strive for promotion of desegregation and "conscious effort should be made to move boundary lines and change feeder patterns which tend to preserve segregation." See 393 F.2d at 694.[1]

In Adams v. Mathews, 403 F.2d 181, the Court of Appeals of this Circuit said: "If in a school district there are still all-Negro schools or only a small fraction of Negroes enrolled in white schools or no substantial integration of faculties and school activities then, as a matter of law, the existing plan fails to meet constitutional standards as established in *Green*." Further, the duty of a Board to desegregate a dual school system includes the constitutional obligation to take *affirmative* action to redistribute and assign faculties and staff members, United States v. Montgomery County Board of Education, 395 U.S.

---

1. Compare the Civil Rights Act of 1964 (42 U.S.C. § 2000c–6(a) (1) which states that "nothing herein shall empower any official or court of the United States to issue any order seeking to achieve a racial balance in any school by requiring the transportation of pupils or students from one school to another or one school district to another in order to achieve such racial balance."

225, 89 S.Ct. 1670, 23 L.Ed.2d 263 (June 2, 1969) [2]; United States v. Board of Education of City of Bessemer, 396 F.2d 44; Davis v. Board of School Commissioners of Mobile County, 393 F.2d 690; United States v. Jefferson County Board of Education, 372 F.2d 836; Aff'd. en banc 380 F.2d 385.

The school desegregation mandates of the Fifth Circuit, as I said in a recent case, beat out, "in cicadian and circadian refrain * * * a tom-tom ostinato of 'affirmative duty,' 'unitary, nonracial system,' 'failure of freedom of choice,' 'wiped out root and branch,' 'meaningful and immediate progress,' 'not tomorrow but now.'" In one of its recent cases that Court has said, "As a matter of law, there must be student desegregation now, not 10 per cent in 1968–69, 20 per cent in 1969–70, and so on until desegregation eventually is effected." United States v. Choctaw County Board of Education, June 26, 1969.

What the attendance zones will accomplish in bringing about greater racial mixing of the school population is uncertain. At the June hearing the Superintendent of Schools estimated that it will produce a 50% increase which would raise the total number of pupils attending schools in which another race predominates to something over 1500 out of a total enrollment of about 36,500 pupils.

While the Board proceeded in good faith, it did not approach geographical zoning with the *purpose* of producing greater integration. This a Board must do. In United States v. Greenwood Municipal Separate School District, *supra*, it was held that the Yazoo River, "the most natural geographic zone imaginable," could not be used as a school boundary line since it lacks "the potential of promoting desegregation because it covers an all-white residential section."

Mr. Rollins anticipates that under the proposed zoning Negroes will possibly attend every school in the system next year except James L. Fleming Elementary. In the Order handed down last December I suggested that limited freedom of choice would be considered where there were white and Negro schools in a single zone. (Since that time there has been more judicial erosion of the choice concept and its use in any case is constitutionally precarious). The Board proposes freedom of choice schools in three zones. In one of them there are at present two junior high schools (Tubman and Langford) each of which is now predominantly white. Richmond Academy and Tutt High are located in the same zone. The former is predominantly white; the latter entirely colored. The new Washington Road High School is expected to be completed by September, 1970 and is in the same zone. When it opens, Tutt will become a junior high. This new High School facility should considerably change the existing segregation pattern. Further inroads will be made into duality upon the completion of several other new schools, some of which will be opened in 1969–70 and others at the beginning of the ensuing school year.

My experience with freedom of choice in the Southern District of Georgia has been that not a single white student ever chooses to go to a Negro school and only 1% to 8% of the colored pupils select white schools. But I am bound by what the higher courts say and not what parents and students think. The testimony at the June hearing indicated that in 1969–70 there will be several Negro schools with very few white children and several white schools with very few Negro children. A freedom of choice plan (or attendance zones) which produces token integration and under which some all-Negro schools remain is impermissible. However, freedom of

2. In this case the Supreme Court approved an Alabama District Court order which provided that "the board must move toward a goal under which in each school the ratio of white to Negro faculty members is substantially the same as it is throughout the system."

choice will be permitted to continue for the time being in the three zones where the Board proposes its retention. No one knows exactly what integrative results attendance zoning will produce. I feel that the Board has acted in good faith in presenting a plan and we will have to see where it takes us.[3]

I will add that I do not at all relish the job thrust upon me of deciding how public schools should be run. It is far beyond my competence. I cannot think of anyone less qualified to administer school systems. Moreover, I do not have the time to go around telling school boards how to operate schools. This Court has the second heaviest weighted case load of any federal district court. The *Acree* case alone has consumed about 9 days of my time during the past six and one half months. And no matter what I do there will be new motions, more objections and hearings *ad infinitum*. "[B]ut we glory in tribulations also; knowing that tribulation worketh patience; and patience experience." The trouble is, "experience" does not always worketh the "hope" mentioned in Romans, 5.

I am in a quandary. Here it is mid-July and the next school year starts at the end of August. Time is running out. What to do under the circumstances has caused me much concern. In my December decision I said that "Chaos is as much to be avoided as strict legality to be sought." I will follow that principle.

■ I think the wisest thing to do at this time, certainly the most expedient, is to approve temporarily the Board's new zone system and permit same to go into effect at the beginning of the coming (1969–70) school year. We will soon thereafter be able to judge its effects. Because of possible con-

stitutional infirmities of the zoning plan it will not be permanent and this is not a final order.

I have decided to obtain for the Board and for myself help and advice from competent and impartial educators. Provision for technical assistance to school boards is found in the Civil Rights Act of 1964 (42 U.S.C. § 2000c–2).[4] I am going to utilize that section. I direct defendants to apply immediately to the Office of Education, H.E.W., for professional counselling and assistance looking to development of a satisfactory and legal plan at an early date. All necessary information as to the existing plan will be promptly supplied by the Board. In a school system as large as Richmond County's the problem is a complex one. I would like to have recommendations from H.E.W. in my hands by October 1st. It is possible that any plan other than the proposed zone system cannot be put in effect at the second semester of the coming school year. I reserve a ruling on that question until later. I am sure the defendants will closely cooperate with H.E.W. Before any plan is approved a hearing will be held. The recommendations of experts should be of great value to the Court.

■ Meanwhile, further faculty integration cannot be delayed. During the past school year there were 20 Negro teachers in white schools and 33 white teachers in Negro schools. Four colored staff members served in white schools and 2 white staff members in Negro schools. A total of 1779 teachers (including staff) served in the system during the past year, 1165 white and 614 colored. The defendants are directed to transfer 40 teachers at the start of the 1969–70 school year. They will be in addition to white teachers now assigned to Negro schools and colored teachers

---

3. A Negro member of the Board, Reverend N. T. Young, has said that in his opinion "an honest effort is being made." Augusta Chronicle, July 10, 1969.

4. "The Commissioner is authorized, upon the application of any school board, State,

municipality, school district, or other governmental unit legally responsible for operating a public school or schools, to render technical assistance to such applicant in the preparation, adoption, and implementation of plans for the desegregation of public schools."

presently teaching in predominantly white schools. Approximately 25 white faculty members will be assigned to predominantly Negro schools and approximately 15 colored faculty members will be transferred to predominantly white schools. They shall be distributed as widely as is practicable. In 1970–71 there will be additional faculty integration. More integration on the staff level is also required for the coming school year. I fix no minimum, leaving that up to the Board.

Finally, I repeat the language of Chief Judge Brown of the Court of Appeals for this Circuit in the decision handed down a year ago in this case:

"We think it not necessary to do more than call the attention of the respondent here to the extremely important obligation which is once more placed on the Board to assume its full responsibility to do all that is reasonably feasible, and *now*, to bring an end to the dual system of white and Negro schools in Richmond County."