Robert L. ACREE et al., Plaintiffs,

v.

Ann Gunter DRUMMOND et al.,
Plaintiffs in Intervention,

v.

**COUNTY BOARD OF EDUCATION OF
RICHMOND COUNTY, GEORGIA,
et al., Defendants.**

Civ. A. No. 1179.

United States District Court,
S. D. Georgia,
Augusta Division.

Jan. 13, 1972.

John H. Ruffin, Jr., Augusta, Ga.,
for plaintiffs.

O. Torbitt Ivey, Jr., Augusta, Ga., for
intervenors.

Franklin H. Pierce, Augusta, Ga., for
defendants.

## ORDER

LAWRENCE, Chief Judge.

This case has been around since 1964.
I came into it in the Fall of 1968.

At that time a freedom of choice plan
was in effect in Richmond County
schools. The total enrollment of white
and black children in 1967–1968 was ap-
proximately 35,750 students. Of 12,250
Negro students in the school population
5.5% chose to attend previously all-white
schools. With one exception no white
student had exercised freedom of choice
to attend a previously all-black school.

Judge Scarlett held hearings in the
Spring of 1968 on a motion by plaintiffs
to adjudge the School Board in contempt
and for summary judgment. He denied
such relief. On appeal the Fifth Circuit
reversed that ruling. See 399 F.2d 151.
The appellate court said:

"  .   .   .  we think it quite ap-
propriate to point to the fact on the
undisputed statistics presented to us
it is clear that, with respect to the
Richmond County Board of Education,
a plan of desegregating the schools,
generally known as 'the freedom of
choice' plan, has not worked. It has
not produced a unitary school system
in which there are no longer Negro
schools and white schools, generally
known and recognized by all as such.
Under these circumstances, it becomes
the duty of the respondent Board, not
only under the Supreme Court deci-
sions above referred to, but under our

Jefferson decree, to take additional important and effective steps."

After the ruling was handed down the Fifth Circuit Court of Appeals assigned the case to me. A hearing was held at Augusta in December, 1968. I said that freedom of choice was impermissible. It had not worked. The Supreme Court had made this clear in Green v. County School Board of New Kent County, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 where the highest Court ruled that freedom of choice must be an effective device promising "meaningful and immediate progress toward disestablishing state-imposed segregation." The Court said that "The burden on a school board today is to come forward with a plan that promises realistically to work, and promises realistically to work *now*."

I did not rule out freedom of choice altogether but stated that I would "give consideration to a plan formulated by the Board which combines automatic assignment of pupils within designated geographical zones and a limited freedom of choice of schools." See Acree v. County Board of Education of Richmond County, Georgia, 294 F.Supp. 1034. I directed that a zone or attendance area system be put into effect for the 1969–1970 school year.

On June 16, 1969, a hearing on the Board's plan was held at Augusta. Plaintiffs objected to it *in toto*. On July 14, 1969, I approved the plan presented as a temporary expedient. See 301 F.Supp. 1285. I pointed out:

"The decisions of the Court of Appeals for the Fifth Circuit say that geographic zones are acceptable only if they tend to disestablish rather than reinforce the dual system of segregated schools. Davis v. Board of School Commissioners of Mobile County, 393 F.2d 690; United States of America v. Greenwood Municipal Separate School District, 406 F.2d 1086 (Feb. 4, 1969); Henry v. Clarksdale Municipal Separate School District, 409 F.2d 682. A school board must strive for promotion of desegregation and 'conscious effort should be made to move boundary lines and change feeder patterns which tend to preserve segregation.' See 393 F.2d at 694."

I further stated:

"I think the wisest thing to do at this time, certainly the most expedient, is to approve temporarily the Board's new zone system and permit same to go into effect at the beginning of the coming (1969–70) school year. We will soon thereafter be able to judge its effects. Because of possible constitutional infirmities of the zoning plan it will not be permanent and this is not a final order."

My Order of July 16, 1969, directed the School Board and Superintendent to apply immediately to the Office of Education, H.E.W., for professional counselling and assistance looking to development of a satisfactory and legal plan at an early date.

Before such a plan could be developed and presented the plaintiffs filed an appeal to the Court of Appeals for the Fifth Circuit. This was in March, 1970. On July 15th of that year that Court remanded the case. See 443 F.2d 1360. The higher Court said:

"Having examined the record and the briefs of counsel in the above styled and numbered cause, this Court is left with a very definite and indelible impression—the Richmond County, Georgia public schools are racially identifiable, both as to the faculty and the composition of the respective student bodies. If there is any hope remaining for the Richmond County public schools to operate as a unitary system by the commencement of the new school year—prompt and immediate action is required."

In compliance with the Order by the Fifth Circuit a hearing was held and evidence introduced on July 30, 1970. On August 3rd I approved a plan recommended by Health, Education and Welfare which I modified to include additional pairing. It was essentially a neighborhood plan. The Fifth Circuit had gone along with something similar

in the case of Ellis v. Board of Public Instruction of Orange County, Florida, 423 F.2d 203. I took that route. The plan in question was to be implemented at the 1970–1971 school year.

My Order of August 3, 1970, in the *Acree* case was appealed to the Fifth Circuit. Meanwhile, the "busing" and racial ratio cases, including Swann v. Charlotte-Mecklenburg Board of Education, had reached the Supreme Court of the United States. The Court of Appeals held its ruling in abeyance pending a decision in *Swann* and the other cases. It was handed down by the Supreme Court on April 20, 1971. See 402 U.S. 1–48, 91 S.Ct. 1267, 28 L.Ed.2d 554. That decision made it clear (I quote the syllabus in *Swann*) that:

(a) While the existence of a small number of one-race, or virtually one-race, schools does not in itself denote a system that still practices segregation by law, the court should scrutinize such schools and require the school authorities to satisfy the court that the racial composition does not result from present or past discriminatory action on their part.[1]

(b) A student assignment plan is not acceptable merely because it appears to be neutral, for such a plan may fail to counteract the continuing effects of past school segregation. The pairing and grouping of noncontiguous zones is a permissible tool.

(c) The District Court's conclusion that assignment of children to the school nearest their home serving their grade would not effectively dismantle the dual school system is supported by the record, and the remedial technique of requiring bus transportation as a tool of school desegregation was within that court's power to provide equitable relief.

On July 1, 1971, 443 F.2d 1360, the Court of Appeals for this Circuit disapproved the plan which this Court had approved in July, 1970, to be put into effect during the current school year. It remanded the case, stating:

"The judgment of the district court as it relates to student and faculty assignment is vacated and the case is remanded with direction that the district court required the school board forthwith to constitute and implement a student and faculty assignment plan that complies with the principles established in Swann v. Charlotte-Mecklenburg Board of Education, 1971, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554; Carter v. West Feliciana Parish School Board, 5 Cir., 1970, 432 F.2d 875, and Singleton v. Jackson Municipal Separate School District, 5 Cir., 1970, 419 F.2d 1211, insofar as they relate to the issues presented in this case."

The Court of Appeals has said that the prevailing system is a dual and an unconstitutional one. The racial statistics bear this out beyond all doubt. They reveal that in the elementary schools during the 1970–1971 year seventeen were predominantly white and nine predominantly black.[2] There were four all-black elementary schools and one all-white. In eleven elementary schools the minority attendance was 5% or less of the whole and in three other schools the minority ratio was 10% or less of the entire school population.[3] On the secondary school level in 1970–1971, out of seventeen schools there was one all-black and two 99% black schools. There were six predominantly white schools in which the Negro ratio was less than 10% and two predominantly black schools with an attendance by white students of 6% or less. Two other secon-

---

1. The Fifth Circuit has been telling us for years that "If in a school district there are still all-Negro schools or only a small fraction of Negroes enrolled in white schools . . . then, as a matter of law, the existing plan fails to meet constitutional standards established in *Green*." Adams v. Mathews, 403 F.2d 181.

2. I have used an 85% ratio as illustrating a predominantly white or predominantly black school.

3. For example, at Southside this year there are 680 students of whom 8 are black.

dary schools had a white ratio of 88% of the school population.

The current school year has produced inevitably (since the same plan is in effect) the same segregated picture. The projected attendance indicated that there are forty-one schools in which white students predominate. They have a total enrollment of 24,721 of whom 20,648 are white and 4,073 are black. In eighteen black schools in the system which have a total enrollment of 12,941 there are 360 white students (2.8%).

Following the decision of the Circuit Court of Appeals on July 1, 1971, I promptly ordered the Board to present a student and faculty assignment plan to this Court not later than July 21, 1971. I assigned a hearing on it for July 28th. Subsequently, upon oral request I extended to August 26th the time for presentation of such a plan. A hearing was held on that date.

To my amazement, the H.E.W. officials did not show up at the August 26, 1971, hearing. Without notice or excuse and at whose behest I do not know they did a disappearing act. The Board's behavior was no less contemptible. They passed the buck to the Superintendent of Schools, who, no doubt under instructions, presented a "plan" to the Court on behalf of the Board. What that individual did recommend does not surprise me in the light of his statement to this Court at the hearing held in Augusta on December 16, 1971. I inquired of him what plan he would suggest to the Court for the integration of the school system and his reply was, "Freedom of Choice." The plan presented by the School Superintendent at the "hearing" on August 26th last was to keep the school zones as they were except for two or three minor changes as to boundaries. One of them would have transferred about 100 white students to an all-black high school. This plan, so learned counsel for the Board informed me, made the system a unitary one, if it was not already such.

In Acree v. County Board of Education of Richmond County, 399 F.2d 151, the Court of Appeals said: "We think it not necessary to do more than call the attention of the respondent here to the extremely important obligation which is once more placed on the Board to assume its full responsibility to do all that is reasonably feasible, and *now*, to bring an end to the dual system of white and Negro schools in Richmond County." The Richmond County Board and its Superintendent have abdicated their responsibility. They have been contemptuous and intransigent. They have chosen to ignore the Constitution and the courts. Apparently, they, together with a segment of the population of Richmond County, deem themselves above and beyond the law. The Fourteenth Amendment is not to apply to those who find it not to their liking.

At the conclusion of the August hearing I stated that this Court would employ its own experts at the Board's expense to do what it and the school officials refused to do in the way of devising a plan of desegregation. Five days later the Court obtained the services of two well-known educators, experienced in desegregation planning, Dr. J. Howard Munzer and Myrl G. Herman of the faculty of Rhode Island College.

Alternative plans were presented in the Munzer-Herman suggestions which were filed in this Court on September 27, 1971. The several Plans do not set out to establish any set numerical ratio of blacks to whites. However, through clustering and pairing it achieves a not dissimilar result.

Four elementary school plans are proposed. Plan I involves an unacceptable minimum amount of integration. Plan II involves more desegregation and Plan III (which I am adopting) even more. Plan IV would provide for maximum desegregation embraced and involved all but two elementary schools.

Two plans were presented for desegregation of the secondary schools. The plan is the same for the following schools: Josey, Murphey, Butler, Tutt, Langford, Richmond Academy and Laney. Under both Plan I and Plan II at

the secondary level the schools mentioned would house the following grades.

Josey—Grades 8–9

Murphey—Grade 10

Butler—Grades 11–12

Tutt—Grades 8–9

Langford—Grades 8–9.

Richmond Academy—Grades 11–12

Laney—Grade 10

In both Plan I and Plan II Tubman will house grade 8 and Johnson grade 9. However, under Plan I Tubman would have 511 students, 50% black, and Johnson would have 492 students, 45% black, whereas under Plan II Tubman has 461 students, 45% black, and Johnson has 442 students, 39% black. The basic difference in the two secondary school Plans is that Plan I does not involve Sandbar Ferry or Sego whereas under Plan II these two schools are paired in such a way that Sandbar Ferry is grade 8 and Sego is grade 9.

After the plans were filed, I asked the parties for their analysis, comments and criticisms. The plaintiffs complained, among other things, that presently all-black Laney and Josey were reduced in status from graduating high schools and that this was not done in the case of any predominantly white senior high school.

The Board's response was of expected quality and content. It raises every carping, contumacious objection conceivable. It is a mishmash and embranglement of letters from individual members of the Board, the Superintendent and principals opposing desegregation of the system. There are resolutions, letters, speeches, newspaper clippings, et cetera. The response contributes less than nothing to the difficult problem the Board faced but fled.

Meanwhile, in October, 1971, I permitted a group of white parents to intervene who are opposed to busing though they say they are not opposed to integration *per se*. I will add that if there is any way to dismantle a dual school system, and the Richmond County Board perpetuated one long after the 1954 decision in Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873, I am not aware how the constitutional imperative can ever be achieved without substantially increasing the transportation of students.

At my suggestion, the Intervenors presented a plan for consideration. It is entitled "Quality Education Plan for the People of Richmond County, Georgia." The plan is nothing more than Freedom of Choice both for students and faculty. Since the Intervenors have a right of appeal from this Order the higher court can enlighten us as to my evaluation of the "plan" proposed. Anyone who has even casually examined the decisions of the United States Supreme Court and of the Court of Appeals for this Circuit must know that choice plans are not constitutionally acceptable in a case such as this. In fact, the latter Court said exactly as much concerning the Richmond County system. See 399 F.2d 152.

On October 8, 1971, Dr. Munzer and Mr. Herman returned to Augusta to confer with the Court concerning the proposed desegregation plans. On the same day, with counsel and the Superintendent of Schools present, the plans were explained and discussed by the experts in the courtroom.

A full evidentiary hearing was held on December 16–17, 1971, for the purpose of considering a plan and for hearing evidence which the Intervenors desired to offer in opposition thereto. Witnesses for the Intervenors testified as to the effect of the Munzer-Herman plans on the R.O.T.C. program and on the exceptional children and model reading programs. The Director of Transportation stated that the Richmond County school system has 97 buses, including four assigned to special education. Eighty-three operate daily and there are 10 spare buses. In the last school year more than 12,000 students of a total of 34,619 were bussed. It was estimated that under the proposed plan 27 new buses would be required at a cost of

$12,400 each with an annual operational cost of $5,000 per bus.[4] Under Plan III, 5,681 additional elementary students would be transported. On the secondary level, Plan I contemplates bussing of 1,-664 additional high school and junior high students. Plan II (secondary) calls for the transportation of 2,150 more students than are now being bussed. The estimates of increased transportation needs are possibly over-estimated by Dr. Munzer and Mr. Herman.

Counsel requested the Court to delay implementation of any plan pending discussions among the parties as to devising one (particularly on the secondary school level) which would be satisfactory. I granted a twenty-day extension for that purpose. That period has passed without any agreement being reached. Of course, in any event, the parties would not be permitted to stipulate away the mandate of the Constitution as to establishment of a unitary school system—one in which there are neither white nor black schools, just schools.

■ On July 1, 1971, the Fifth Circuit ordered that this Court require the Richmond County School Board "forthwith" to constitute and implement a constitutional student assignment plan. That means now, at once, without delay or interval. Because of the Board's wilful failure to carry out its constitutional duty the mandate of the higher Court could not be complied with. To obviate the system being closed down indefinitely I permitted the carrying on of a dual system at the beginning of the year. It is still in effect.

Last June I handed down an Order which fully integrated the secondary schools in the Chatham County system (with one necessary exception). I delayed action on the elementary level as the Board wished more time and had not

been able to agree on a plan. My decision was appealed and the ruling reversed. This Court was instructed to "forthwith" desegregate the elementary as well as secondary schools. This was done by the Court early in September, 1971. The situation in the Chatham County school case differs only from the Richmond County case in that the former involved the beginning of a school year and the latter the middle of such a year.

■ I realize that February is a poor time to revolutionize a school system. Significant educational problems are especially involved in massive changes in student populations of senior high schools during the academic year. Student schedules have already been planned for the year. Athletic programs have been developed and implemented, Seniors have spent one half of the year in present locations and have planned senior year activities, including ordering rings and yearbooks.

But a start must be and will be made. It will commence with certain elementary schools and will be effectuated in three phases. Phase One of Plan III proposed by the Court's experts will be implemented not later than February 15, 1972. The initial implementation will apply to two clusters of elementary schools represented by Zone A (Telfair, Evans, Milledge and Houghton) and by Zone D (White, Wilkerson Gardens and Bungalow Road elementary schools). I will comment subsequently on the closing of Houghton elementary.

Phase Two will be implemented on or before March 15, 1972. This Phase involves Zones E and I under Plan III. The elementary schools affected are Jenkins and Fleming which will be paired and Griggs and Southside which will

---

4. The same objection as to cost of increased transportation was made in the Savannah case. With staggered bus schedules, the increased needs have been handled (though with difficulty) by the existing equipment. The Chatham County system has approximately the same number of buses as Richmond County and about the same enrollment.

likewise be paired on or before March 15th next.

Plan III as related to other elementary schools in the system will be implemented on September 1, 1972.

Below is reviewed the effect of Plan III on the elementary schools with special relation to pupil population and available classroom space.

## PHASE ONE, PLAN III

## ELEMENTARY SCHOOLS

### Zone A

At the evidentiary hearing on December 16, 1971, objections were raised by the Intervenors to the closing of Houghton elementary as proposed in each of the four elementary plans involving Zone A. Opponents thereof did not believe that the three other elementary schools in the Zone (Evans, Telfair and Milledge) would be capable of housing both regular classes and the special education classes, particularly the special education pupils at Evans.

An analysis of pupil population and available space in Zone A is set out below. It indicates that there is adequate space at Telfair, Evans and Milledge for all pupils, including special education children.

| | Pupils per Plan | Grade | Class Room Needs | Special Ed. For 1971 | Rms. Needed Plan and Sp. Ed. '71 | Rooms Available | Rooms +/− |
|---|---|---|---|---|---|---|---|
| Telfair | 431 | 6–7 | 17 | 31–2 | 19 | 19 | 0 |
| Evans | 433 | 4–5 | 17 | 72–11 | 28 | 23 | −5 |
| Milledge | 658 | 1–3 | 26 | 0–0 | 26 | 31 | +5 |
| | | | | | 73 | 73 | |

As appears in the above table, there is a shortage of classrooms at Evans Elementary should no special education children be moved from that school. There are at least two solutions to this problem. Solution one would require the movement of five special education classes from Evans to Milledge. Solution two would call for movement of the fourth grade from Evans to Milledge, that is to say, the fourth grade as presented in the Munzer-Herman Plan III.

With respect to solution one, no change from Plan III as originally presented is required other than the movement of the special education children as referred to above.

Under the second solution, the following attendance results would obtain:

| Telfair | | Milledge | | | Evans | | |
|---|---|---|---|---|---|---|---|
| | | Grades | W | B | Grade | W | B |
| Same as in original Plan | | 1 | 153 | 91 | 5 | 126 | 86 |
| | | 2 | 154 | 91 | | | |
| | | 3 | 102 | 67 | | | |
| | | 4 | 121 | 100 | | | |
| | | | 530 | 349 | | | |
| | | Total | | 879 | Total | | 212 |
| | | Percentage of Blacks | | 38.5% | Percentage of Blacks | | 40.6% |

The Court leaves to the Board of Education (or Superintendent) the matter of determining whether Houghton Elementary should or should not be closed. If it is closed (and the evidence satisfies the Court that it is substandard) solution one which involves no change from the Plan as originally presented as re-

lated to standard classrooms and grades seems preferable. If it should be determined not to close Houghton and if it should be included in Zone A along with Telfair, Evans and Milledge, the following distribution of pupils is indicated by the Plan:

| Telfair | | | Evans | | | Houghton | | | Milledge | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Grade | W | B | Grade | W | B | Grade | W | B | Grade | W | B |
| 6 | 124 | 99 | 3 | 102 | 67 | 4 | 121 | 100 | 1 | 153 | 91 |
| 7 | 121 | 87 | | | | 5 | 126 | 86 | 2 | 154 | 91 |
| | 245 | 186 | | | 169 | | 247 | 186 | | 307 | 182 |
| Totals | 431 | | | | | | 433 | | | 489 | |
| Percentage of Blacks | 43.1% | | | 39.5% | | | 43.0% | | | 37.2% | |

| | Telfair | | Evans | | Houghton | | Milledge | |
|---|---|---|---|---|---|---|---|---|
| | Teachers | Children | Teachers | Children | Teachers | Children | Teachers | Children |
| Sp.Ed | 2 | 14 | 6 | 6 | 0 | 0 | 0 | 0 |
| Rooms Avail. | | 19 | | 23 | | 22 | | 31 |
| Rooms Needed | | 19 | | 18 | | 17 | | 20 |

Zone A presents no serious transportation problem. The distances are not great between the clustered schools.

### Zone D

Under Plan III, Zone D, White, Wilkinson Gardens and Bungalow Road elementary schools are clustered. The Zone embraces a rather small geographical area and transportation distances are relatively short. There is no indication of space problems resulting from special education pupils.

The plan proposed for clustering of these three elementary schools in Zone D is adopted and will be implemented at the same time as Zone A, that is, on or before February 14, 1972. The pupil population in the four schools in Zone D as related to available space will be approximately as is shown in the original plan. It is illustrated in the table below:

| | Pupils per Plan | Grades | Class Room Needs | Sp.Ed. '71 Children/ Teachers | Rms. Needed Plan and Sp.Ed. '71 | Rooms Avail. | Rooms * + or − |
|---|---|---|---|---|---|---|---|
| White | 785 | 5–7 | 31 | 0–1 | 31 ** | 31 | 0 |
| Wilkinson Gardens | 576 | 1–2 | 23 | 0–1 | 23 ** | 24 | +1 |
| Bungalow Road | 579 | 3–4 | 23 | 16–1 | 24 | 29 | +5 |
| | | | | | 78 | 84 | |

\* The last column shows the number of rooms in excess (+) if Plan III is implemented and if the special education population as of the Fall of 1971 does not move. The minus sign indicates room shortage.

\*\* I assume that no classroom is needed since no grouping of special education children is indicated for these schools.

## PHASE TWO, ELEMENTARY

### Zone E

Phase Two of the implementation of Plan III is approved and adopted and will be implemented not later than March 15, 1972. This Phase relates to Zone E and Zone I.

Zone E is made up of Jenkins and Fleming elementary which will be paired. No problem exists in respect to special education pupils.

An analysis of pupil population and available pupil space in the pairing of Jenkins and Fleming appears below:

| | Pupils per Plan | Grade | Class Room Needs | Sp.Ed. for '71 Ch/Tchr. | Rms. Needed Plan and Sp.Ed. '71 | Rooms Avail. | Rooms + or − |
|---|---|---|---|---|---|---|---|
| Jenkins | 332 | 1–3 | 13 | 15–2 | 15 | 15 | 0 |
| Fleming | 320 | 4–7 | 13 | 22–2 | 15 | 32 | +17 |

### Zone I

Zone I involves the pairing of Griggs and Southside elementary schools. The transportation problem presents greater distances than Zones A, D or E. Griggs and Southside are located approximately 4.2 miles straight line distance from each other. The analysis of pupil population and available space indicates the following with respect to this Zone:

| | Pupils per Plan | Grade | Class Room Needs | Sp.Ed. for '71 Ch/Tchr. | Rms. Needed Plan and Sp.Ed. '71 | Rooms Avail. | Rooms + or − |
|---|---|---|---|---|---|---|---|
| Griggs | 463 | 5–7 | 18 | 17–2 | 20 | 21 | +1 |
| Southside | 650 | 1–4 | 26 | 0–0 | 26 | 15 | −11 |

As indicated by the above table, there is a shortage of eleven rooms at Southside. The school district data furnished by the Superintendent's office shows that Southside has fifteen rooms. This would give it a capacity of 375 pupils on the basis of 25 pupils per classroom. However, it is noted that at the present time the school has an enrollment of 675. It follows that there must be more than fifteen classrooms at Southside elementary. Plan III, Zone I, indicates a school population of 650 at Southside which is smaller than the present enrollment figure.

## PHASE THREE, ELEMENTARY

The third and final phase of desegregation of the elementary schools in Richmond County involves Zones B, C, F, G, H and the Alternative Zone outlined on page 45 of the original plan of desegregation. Phase Three will be fully implemented on September 1, 1972. I have deferred the desegregation of the schools in these zones until the beginning of the next school year and in doing so have taken into consideration the fact that the transposition from a dual system to a unitary system will involve adjustments of a major character and that it is impractical and unwise to convert the system overnight at mid-year.

Zones B, C and F in Plan Three present no space or special education problems. An analysis of pupil population and space availability in regard to the four Zones in question shows as follows:

## Zone B

|  | Pupils per Plan | Grade | Class Room Needs | Sp.Ed. '71 Children/ Teachers | Rms. Needed Plan and Sp.Ed. '71 | Rooms Avail. | Rooms + or − |
|---|---|---|---|---|---|---|---|
| Walker | 932 | 5–7 | 38 | 43–3 | 41 | 43 | +2 |
| Lamar | 411 | 1–3 | 16 | 10–1 | 17 | 23 | +6 |
| Monte Sano | 544 | 3–4 | 22 | 0–0 | 22 | 23 | +1 |
| Lake F. Dr. | 267 | 1–2 | 11 | 0–0 | 11 | 13 | +2 |

## Zone C

|  | Pupils per Plan | Grade | Class Room Needs | Sp.Ed. '71 Children/ Teachers | Rms. Needed Plan and Sp.Ed. '71 | Rooms Avail. | Rooms + or − |
|---|---|---|---|---|---|---|---|
| Collins | 951 | 5–7 | 38 | 19–2 | 40 | 41 | +1 |
| Bayvale | 684 | 1–3 | 27 | 0–0 | 27 | 29 | +2 |
| Copeland | 554 | 3–4 | 22 | 0–0 | 22 | 23 | +1 |

## Zone F

|  | Pupils per Plan | Grade | Class Room Needs | Sp.Ed. '71 Children/ Teachers | Rms. Needed Plan and Sp.Ed. '71 | Rooms Avail. | Rooms + or − |
|---|---|---|---|---|---|---|---|
| Craig | 506 | 1–3 | 20 | 0–0 | 20 · | 20 | 0 |
| Hains | 692 | 4–7 | 28 | 0–0 | 28 | 30 | +2 |

## Zone G

Zone G, Plan III, clusters Weed, Robinson and Merry elementary schools. An analysis of pupil population and available space in Zone G shows:

|  | Pupils per Plan | Grade | Class Room Needs | Sp.Ed. '71 Children/ Teachers | Rms. Needed Plan and Sp.Ed. '71 | Rooms Avail. | Rooms + or − |
|---|---|---|---|---|---|---|---|
| Weed | 143 | 5 | 6 | 0–0 | 6 | 12 | +6 |
| Robinson | 294 | 6–7 | 18 | 40–4 | 22 | 16 | −6 |
| Merry | 523 | 1–4 | 21 | 0–0 | 21 | 22 | +1 |

No space or special education problems are involved in Zone G. A problem does exist which grows out of the need of six additional classrooms for special education pupils at Robinson. Acceptable solutions include the following:
(1) Move 6 classes for special education to Weed Elementary School or
(2) Move Grade 6 to Weed Elementary School.
The Board of Education may adopt one or the other of these solutions.

## Zone H

Zone H clusters Floyd, Garrett and National Hills elementary schools. Pupil population and available space analysis indicates the following as to Zone H:

|  | Pupils per Plan | Grade | Class Room Needs | Sp.Ed. '71 Children/ Teachers | Rms. Needed Plan and Sp.Ed. '71 | Rooms Avail. | Rooms + or − |
|---|---|---|---|---|---|---|---|
| Floyd | 309 | 6–7 | 12 | 0–0 | 12 | 23 | +11 |
| Garrett | 466 | 3–5 | 19 | 20–3 | 22 | 20 | −2 |
| National Hills | 305 | 1–2 | 12 | 0–0 | 12 | 14 | +2 |

There is an indicated shortage of two classrooms at Garrett. Solutions for this problem include:

(1) The shifting of two special education classes to Floyd Elementary School or to National Hills.

(2) The shifting of Grade 5 from Garrett to Floyd Elementary School.

The Board of Education may adopt one or the other of these possible solutions.

## ALTERNATIVE PLAN

See pages 45 and 46 of original Munzer-Herman Plan)

The Alternative Plan includes Glenn Hills, Terrace Manor and Wheeless Road schools. The percentages of black pupils in Glenn Hills and Terrace Manor are high, averaging 48.1 per cent in the two schools. If these schools should be combined with Wheeless Road School which is predominantly white, the average percentage of black pupils would be 34.2. There is presently a total enrollment of 1,684 pupils in the three schools and a capacity of 1,650 according to school data. Consequently, there is a need for two additional classrooms which, logically, would accommodate a class at Glenn Hills school and a class at Wheeless Road school.

The result of combining Glenn Hills, Terrace Manor and Wheeless Road schools according to an analysis of pupil population and available space is shown below:

|  | Pupils per Plan | Grade | Class Room Needs | Sp.Ed. '71 Children/ Teachers | Rms. Needed Plan and Sp.Ed. '71 | Rooms Avail. | Rooms + or − |
|---|---|---|---|---|---|---|---|
| Terrace Manor | 508 | 1–2 | 20 | 0–1 | 20 | 21 | +1 |
| Glenn Hills | 340 | 3–4 | 13 | 0–0 | 14 | 13 | −1 |
| Wheeless Road | 836 | 4–7 | 33 | 0–1 | 33 | 32 | −1 |

## SECONDARY SCHOOLS

The desegregation of the secondary school system in Richmond County presents the same difficulties that is experienced in any large urban school district. The problems stem not only from vestiges of State-imposed segregation but from the practice since 1954 of school boards perpetuating dual systems by building schools designed to draw either from the white or the black school population, not from both. New schools have been erected with resulting preservation of a segregated system. By and large, the Negro schools lie in the heart of a densely populated black area of Augusta. White schools follow residential patterns. Lack of new and more strategically located middle grade schools compounds the problem.

Irrespective of obstacles, the Fourteenth Amendment, as construed by federal courts, demands that the dual system now in existence be "wiped out root and branch" and "not tomorrow but now." However, you cannot in one day chop down and dig up the stump of a tree which rooted two centuries ago. Desegregation will be delayed on the secondary level until September 1, 1972.[5] It must be fully accomplished by that date and will be. As I stated on another occasion, it is phantasy approaching autism to think that the Constitution of the United States treats Augusta differently from other places where a dual system is the result of *de jure* school segregation. Richmond County is no different from 42 other school districts in the Southern District of Georgia in which desegregation is now an accom-

5. Of course, in event of appeal and reversal of this Order the Board must be prepared to desegregate *all* schools during this year.

plished fact; admittedly with travail in certain cases.

Earlier in this Order, I referred to some of the difficulties of mid-year desegregation, particularly high schools. At this time and during the current school year it would be chaotic, if not impossible, to implement any major plan in respect to desegregation of secondary schools in Richmond County. More than that, there is at present no plan before the Court upon which it can act. Dr. Munzer and Mr. Herman presented two alternative plans for desegregation of secondary schools but at the hearing on December 16th last the possibility was raised that there might be discrimination against the plaintiffs in that Josey and Laney High Schools, which are all-black or practically so, would no longer be graduating schools whereas none of the predominantly white senior high schools have been thus treated in the plans. I have asked that the experts suggest alternative plans as to the secondary schools in the Richmond County system dealing with that problem.

### ORDER

(1) It is ordered and decreed that the desegregation of the elementary schools in the Richmond County system shall be in accordance with this Order. Defendants are directed promptly to take all necessary steps to the end that Plan III shall be implemented in the three phases described in this Order. No stay will be granted pending any appeal by any party from this Order.

(2) Responsibility as to implementation will be and is imposed upon the Board and the Superintendent of Schools and they are ordered to fully and timely implement Plan III for the elementary schools. If the Board does not act promptly in any case in which any discretionary authority is conferred upon it by this Order, the discretion in that respect will be exercised by the Superintendent and he is directed in any such instance to act and full responsibility is imposed upon him.

(3) Minor adjustments in the Plan may be made by defendants as to alternate assignments in the instance of special education classes provided that the desegregation levels outlined in the plans are maintained.

(4) The Superintendent of Schools shall file a report in writing with this Court on January 19, 1972, detailing what has been done by him and by the defendant Board since this Order was signed in preparing, planning and carrying out the implementation of Phase One and Phase Two of Plan III. Similar written reports shall be filed by him at the end of each successive three-day period after such date until further order of his Court.

(5) Meanwhile, the Court will continue to consider and to endeavor to formulate and develop a feasible and sound plan of desegregation for the secondary schools in the system. At the earliest practicable time an Order in that respect will be entered. The secondary school plan approved and ordered by the Court will be implemented by defendants on September 1, 1972.

(6) The defendant Board and the Superintendent will file in this Court within 15 days a report showing the total enrollment during the present school year in every school in the system and the number of blacks and whites in each such school. The report will also include information as to racial composition of faculty and staff in the schools.

(7) It is further ordered that the Board shall immediately review existing staff and faculty racial ratios and shall forthwith comply, on a system-wide basis, with the provisions for "Desegregation of Faculty and Other Staff" as set forth in Singleton v. Jackson Municipal Separate School District et al., 419 F.2d 1211 (5 Cir.). The School Board is directed to file semi-annual reports during each school year similar to those required in United States v. Hinds County School Board (5 Cir.), 433 F.2d 611, 618.

(8) The pending motions filed by the plaintiffs for appointment of a receiver for the Richmond County system and for adjudging the defendants in contempt will be held in abeyance, at least for the present.

(9) The evidence at the hearing on December 16, 1971, indicates that there are numerous instances where pupils are attending schools in zones outside their actual residence. The Board, Superintendent and school officials are ordered promptly to undertake corrective measures in respect to boundary observance. A report in that respect shall be furnished not later than February 1, 1972.

(10) The motion for award of attorney's fees to plaintiffs' counsel is granted. The amount of the fee will be settled on affidavits or, if necessary, following a hearing on the subject.

(11) The defendant Board will, as a part of the costs in the case, pay the compensation and expenses of Messrs. Munzer and Herman for their services to this Court and same are assessed as costs against defendants.